PROVOSTY, J.
The defendant was convicted of “shooting while lying in wait,” the penalty whereof is death, was sentenced, and has appealed.
What his defense was does not appear from the record, unless we are to infer from his having offered to prove threats that he relied on self-defense.
All the parties involved are negroes; de* fendant and the man who was shot, Sam Walker, were brothers-in-law; the scene was the Wemple plantation, in the parish of Oaddo, about 30 miles above Shreveport.
Just after dark, as Sam Walker stepped out upon the gallery of his house, he was shot from out of the darkness. Fortunately he was but slightly wounded. Later the same night, about 3 or 4 o’clock, two shots were fired into the same house at him through a crack in the door. His brother, Dave Walker, had seen defendant in the path leading to the house. From this, or *82 perhaps from statements made by defendant the same night after the shooting to a girl named Simpson, suspicion settled on defendant. Search was instituted for him. In the afternoon, at 2 or 3 o’clock, Dave Walker informed the posse that he had heard footsteps in his house in which there should have been no one. The posse explored the house and were leaving, one of them, George Meyers, remarking, “He is not here,” when defendant, who was concealed in the house, cried out, “Yes he is here,” and at the saíne time shot down George Meyers. The posse surrounded the house and parleyed with defendant; every man keeping behind a tree. Defendant refusing to surrender, they fired volleys into the house. This brought no result. Meantime George Meyers lay wounded and suffering within the range of defendant’s pistols, and no one dared approach to succor him. After a while they asked defendant permission to remove the wounded man, and then to bring him some water; but ■defendant refused, fearing to let any one approach. In about one hour the deputy sheriff and other white men arrived, and, keeping behind trees like the others, parleyed with •defendant. At their request defendant finally allowed the women to come and remove •Geo. Meyers. The deputy sheriff testified as follows:
“I told him I had come there for the purpose of arresting him and to protect him, and to come out and surrender. He told me that he •did not know me from any one else, and he was not going to surrender; did not have but •one time to die and go to hell, and that this was as good a time as any; warned me, if I approached, to look out, that he had two pistols, that he had already shot two, and would get •one or two more, as long as his ammunition held out. I argued with him; told him he was mistaken and wrong. He said he did not see it that way; that he did not propose to surrender, that he had been there all day, and was there for the purpose of killing Dave Walker and his wife. He then saw Dave Walker standing off by my side, and he says, ‘Yonder is the son of a bitch. I want to get him, and I don’t care what you do with me, whether you burn me or not.’ ”
Yidder Wemple, owner of the plantation, testified as follows:
“He recognized my voice, and asked if that was me, and I said, ‘yes.’ He said, ‘I am not going to surrender to any one.’ I told him we would burn the house; he said he did not care a damn; that the house did not cost him anyr thing; one man was not any more than another. He also said that he shot Sam Walker the night before, and that he came in the house for the purpose of shooting Dave Walker and his wife. Finally I told him that it was the sheriff talking and to come out. He said he did not care a damn for the sheriff. After he came out I asked him, ‘Ananias, why did you go into that house?’ He says: T went in there to kill Dave and his wife. If I had killed them I would have been willing for you white peon]e to do what you please, burn me or anything else.’ ”
Defendant was finally induced to surrender. On the way to jail he spoke freely of the shooting of the night before, detailing the circumstances, and giving his motives. That his wife’s brothers were trying to separate him and his wife, and he determined to kill Sam Walker. That he was waiting near the house for that purpose when he heard Walker shut a gate at the lot and start back to the house. That he ran to where he - neard him, but was too late. That Walker went into the house, and at once came back to the gallery in order to hang up a saddle on the wall. That for doing this Walker did not get enough of his body outside of the door or he would have gotten him—meaning would have shot him with more fatal aim. The next morning, in jail, defendant spoke of the shooting to the jailer and to the cook at the jail; and boasted that he had “gotten” two, and was satisfied if he had gotten but one.
The date of the shooting was April 25th. The indictment was found on May 12th. The trial was fixed for May 25th.
Defendant moved for a continuance on the ground of the absence of two witnesses, Bossy and Johnson. By Bossy he expected to prove communicated threats. By Johnson that on the day after the shooting Dave *84 Walker made to the witness the following statement: That he met Ananias coming to gam Walker’s house, and told him not to go there, because Sam Walker would kill him; and that, while they were thus talking, Sam Walker stepped out on the gallery with his gun in his hand, and Ananias shot him. The district attorney admitted that the witnesses, if present, would testify as thus stated, but reserved all objections to the admissibility of the evidence. The court thereupon refused the continuance. Defendant excepted to the ruling, insisting that the district attorney’s admission should have been made without reserve of objections.
On the trial, objection was made and sustained to that part of the affidavit for continuance relating to communicated ' threats and to all other evidence of communicated threats, on the ground that there had been no proof of a hostile demonstration.
Another ruling against defendant was upon his offer to prove that Sam Walker, with the design to sedtice the IS year old sister of defendant, . had induced her to leave her home in Harrison county, Tex., clandestinely, to come to him on the Wemple plantation where he was living; the purpose of the evidence being to attack the credibility of Walker as a witness.
Other rulings adverse to the defendant were the following: Permitting the state to-prove the confessions; also the firing of the two shots through the crack in the door; also the shooting of George Meyers and attending circumstances, refusing a new trial, and overruling a motion in arrest of judgment.
Bills of exception in due form have brought up all the rulings for review; and we must now proceed to consider them:
1. Continuance. Continuances are very largely within the discretion of the trial court. We see no reason for interfering in this case. The complaint is that the district attorney reserved the right to object to the admissibility of the testimony of the two absent witnesses. We fail entirely to see the force of this complaint. When, for the purpose of avoiding a continuance, an admission is made that the absent witness if present would testify as stated in the affidavit for continuance, the testimony of the absent witness is not thereby made any better than it would be if the witness were present. If the testimony would be inadmissible if the-witness were present, it still continues to be so as represented by the affidavit. That is a plain proposition; and, moreover, was expressly ruled on in the case of State v. Chopin, 10 La. Ann. 458. Since the district attorney could have made the objections even if he had not reserved the right to do so, his reserve of the right can certainly not have injured defendant.
2. Confessions. The reasons for objecting to the confessions are tersely and lucidly, and, we may add, somewhat overstrongly, given in defendant’s brief, as follows;
“We submit that the judicial mind cannot come from the reading Of the testimony attached to this bill without the conclusion that this negro boy of 26 years, who had never been in trouble before, had never been arrested or charged with crime, who had not been a rowdy or used to disorderly scenes, but a peaceable, law-abiding, hard-working man, could not have gone through the experiences of that afternoon (as an incident of which he had been compelled to shoot Geo. Meyers), with this cursing crowd threatening his life and shooting into the house at him with guns and pistols, without being in such a condition of mental excitement that he could not have been .responsible for his utterances, and that he was certainly in no condition of mind to make a statement worthy of being dignified as a confession. The whole testimony as to what he said and did shows this. He submitted to arrest when the deputy sheriff finally succeeded in assuring him that he would be protected from Dave Walker and the others.
“Moreover, part of the alleged confession is shown to be untrue, viz.; the statement that he had gone to Dave Walker’s house for the purpose of killing Dave and was only waiting for a chance; for the testimony showed that Dave and his wife had visited the house that day and left it without being molested or even discovering the presence of defendant.”
*86 We find no support in the record for the statement in regard to defendant’s age and antecedents, nor in regard to Dave Walker and his wife’s having visited their house while defendant was concealed in it, and thereby afforded him an opportunity to kill them if he had desired to do so. Nor do we find any support for the contention that the statements made by defendant while bidding defiance to the posse and to the deputy sheriff, and while off his way to jail, and the next day to the cook and the jailer, were the wild and irresponsible talk of a man half crazed by excitement or other disturbing emotion. On the contrary, defendant seems to have been, if not cool, at any rate, undaunted, and entirely self-possessed.
3. Seduction of defendant’s sister. Defendant’s counsel sought to cross-examine Sam Walker touching this alleged seduction or attempt at seduction. The object was to discredit Walker as a witness.
In the first place, the bill of exceptions does not show with certainty what Walker’s testimony was, and hence does not show that the impeachment of his credibility could have affected the result of the case. All that it recites is that he was “the only witness who testified to the circumstances attending the shooting.” Now, so far as the record shows, the only point upon which there could be any dispute in connection with the shooting the identity of the person who fired the shot, and neither the particular bill relating to the point now under consideration nor any other in the record shows that Sam Walker testified on that point. In fact, the very strong inference from the record as a whole is that the shot came out of the night, so that Walker could not, and did not, see who fired it. Assuming, however, that Sam Walker in his examination in chief identified defendant as the person who fired the shot, and that therefore his impeachment might affect the result of the ease, was the refusal to permit questions to be put to him touching this alleged seduction, or attempt at seduction, reversible error?
We think not. The matter was irrelevant to the issue. The issue was simply as to' whether defendant had done this shooting, or not. Even if Sam Walker had been a confirmed depredator upon the virtue of 15 year old girls, that fact could not have justified or excused the shooting at him from ambush; and whether it affected his credibility as a witness would depend upon circumstances. The rule is that a large discretion is left to the trial judge in the matter of how far a witness may on cross-examination be questioned as to irrelevant matters for the purpose of affecting his credibility; and that this discretion will not he interfered with unless abused. State v. Haab, 105 La. 230, 29 South. 725. There was no abuse of the discretion in the instant case. We are satisfied that the going into that side issue would have been purely a waste of time. Nay, worse, might have led the jury to forget that this was a case not between the defendant and Sam Walker, but between the' state and the defendant, and in that way proved detrimental to the proper administration of the law.
So far as cross-examining the witness on this irrelevant matter for the purpose of thereafter contradicting him is concerned, that was clearly inadmissible. State v. Dalcourt, 112 La. 420, 36 South. 479; State v. Wiggins, 50 La. Ann. 330, 23 South. 334.
If Sam Walker could not be cross-examined touching this irrelevant matter, a fortiori could not defendant’s witness Atkins be heard in chief in regard to it?
4. Shooting of George Meyers.' Defendant objected to any evidence touching the shooting of George Meyers, and touching the refusal to permit any one to bring him some water, as being circumstances extraneous to-the crime charged in the indictment and of *88 a nature to prejudice the jury against him. The court let in the evidence as being of conduct indicating a consciousness of guilt. This was correct. 12 Cyc. 396; Elliott, Ev. vol. 4, § 2724. Defendant’s concealing himself and his resisting arrest were signs of a consciousness of guilt, and could be shown, especially the desperateness of the resistance, and it was proper to allow the witnesses to make a connected story of the episode, detailing all the circumstances.
5. The Two Shots through the Crack in the Door. This event, separated by several hours from the crime charged in the indictment, was not a part of the res geste; it was entirely independent. Evidence of independent crimes is inadmissible. Rice on Ev. vol. 3, §§ 153-157; State v. Bates, 46 La. Ann. 849, 15 South. 204; State v. Johnson, 38 La. Ann. 686. But to that rule there are exceptions. Such evidence is admissible to prove intent. 12 Cyc. 408. By his confessions the defendant was identified with the persons who fired these shots, and the act affords strong evidence of the murderous intent with which he is charged in the in•dietment.
6. Threats. The only evidence in the case bearing even remotely on a hostile demonstration is the statement in the affidavit for a •continuance that the witness Johnson, if present, would testify to what Dave Walker had told him. What Walker told the witness was mere hearsay. It may have been .admissible for the purpose of contradicting Walker, but not for the purpose of showing a hostile demonstration.
Moreover, the evidence of there not having been a hostile demonstration is so full, complete, and overwhelming that, clearly, in this case, if in any, the judge was justified in withholding from the jury the question of whether there had been or not such demonstration.
There not having been any proof of a hostile demonstration, the evidence as to threats was properly excluded.
Defendant moved for a new trial, assigning as grounds that the several rulings herein-above reviewed were erroneous and prejudicial. He assigned three other grounds, which we now proceed to consider.
(a) While the jury were being taken out for an airing, and were passing along one of the principal streets of the city (Shreveport, where the case was tried),;, a man standing on one of the cross streets about 80 or 90 feet off, cried out to the jury: “Hang him! Hang him! Hang him!” The leading counsel of defendant was present when the thing happened, and heard the cry. No objection was made to going on with the trial.
In the case of State v. Renaud, 50 La. Ann. 662, 23 South. 894, the court held that the cry, “Put a rope around his neck,” uttered by one of the bystanders in the presence of the jury, did not furnish ground for a new trial; but, assuming argumenti gratia that in such a ease prejudice is presumed (12 Oyc. 718; State v. Hornsby, 8 Rob. 554-558, 41 Am. Dec. 305; State v. Foster, 45 La. Ann. 1176, 14 South. 180; Wharton, Cr. Pl. §§ 838, 729, 821, 822, 847, 814), and that the burden is on the state to rebut the presumption, we think the proof of absence of prejudice has been duly made. The testimony of the jurors, seven of whom were examined on the trial of the motion for new trial, shows that the cry made no impression upon the jury and caused no prejudice.
Moreover, the proper time for making the objection was before verdict. It comes too late after defendant has chosen to take the chances of a favorable verdict. State v. Dorsey, 40 La. Ann. 739, 5 South. 26.
(b) The second other ground for new trial was that:
“The district attorney in his argument to the jury referred to the great and increasing number of killings and capital crimes by negroes in the city of Shreveport and parish of Caddo, and urged the jury to, by their verdict, aid in sup *90 pressing them, and urged that their verdict be guilty as charged.”
The evidence does not establish positively what the district attorney did say, or that he did any more than admonish the jury of their duty to bring in an unqualified verdict, should they find the accusation proved, and no mitigating circumstances. At all events, objection should have been made to the remarks at the time they were made. Before, and not after, verdict.
(c) The third and last ground is that the trial was had at too early a date to allow defendant sufficient time to prepare his defense.
The trial court could best judge as to that. We see no reason to interfere.
Finally, defendant moved in arrest of judgment on the ground that the indictment was fatally defective in that it did not allege that the shooting was done “willfully, maliciously, or with malice aforethought.”
The indictment avers that the defendant “whilst lying in wait, in and upon one Sam Walker, did make an assault, and then and there him, the said Walker, feloniously did shoot with a certain dangerous weapon, commonly called a pistol, with the intent then and there, him, the said Sam Walker, willfully, feloniously, and of his malice aforethought, to kill and murder,” etc.
The statute under which the indictment is drawn reads as follows:
“If any person lying in wait, or in perpetration or attempt to perpetrate any arson, rape, burglary or robbery, shall shoot, stab, cut, strike or thrust any person with a dangerous weapon, with the intent to commit the crime of murder, he shall, on conviction thereof, be punished with death.”
The contention is that the indictment has made the mistake of qualifying the wrong thing—the intent, instead of the act. Instead of saying that the intent was willfully and of malice aforethought, etc., it should have said that the shooting was of that character. The argument by which that contention is sought to be supported is founded upon a comparison and combination of the cases of State v. Marshall, 37 La. Ann. 26; State v. Hunter, 42 La. Ann. 814, 8 South. 583; and State v. Scott, 38 La. Ann. 387. It is pretty, but of no force, and a reproduction of it here would be a useless consumption of time. The rule in cases like the present one is stated, in Bishop, Crim. Pro. vol. 2, § 77, as follows:
“The rule for the indictment is that it must set out the lower' offense as fully and in the same way as though it alone was complained of, and add an averment of intent to commit the higher.
“Assault Intending Murder. Where it is a statutory crime to assault one with intent to kill him, to murder him, or the like, the indictment need only charge that the defendant, at a time and place named, ‘did make an assault’ on him, or in some other form of words, did what' else is necessary to be alleged in an indictment for the simple offense, ‘with intent,’ for illustration, ‘then and there feloniously, willfully, and of his malice aforethought, to kill and murder’ such person. It is not necessary to charge that the assault was on ‘purpose,’ or of ‘malice aforethought,’ if these words are not in the statute.” Section 77, vol. 2. See, also sections 651 and 652, same author and same volume.
See, also, State v. Bradford, 33 La. Ann. 921; State v. Buford, 52 La. Ann. 539, 26 South. 991; State v. Frances, 36 La. Ann. 336, and cases there cited. The motion in arrest was properly overruled.
It is therefore ordered, adjudged, and decreed that the judgment be affirmed.