**Thomas GOINS, Appellant,**

v.

**J. Wayne ALLGOOD, Warden, Louisiana State Penitentiary, Appellee.**

**No. 24859.**

United States Court of Appeals
Fifth Circuit.

March 12, 1968.

---

4. See 28 U.S.C.A. § 1912; Fifth Circuit Rule 31, ¶ 2.

James D. McGovern, Jr., New Orleans, La., for appellant.

John E. Jackson, Jr., Asst. Atty. Gen., New Orleans, La., for appellee.

Before RIVES and GODBOLD, Circuit Judges, and HUGHES, District Judge.

RIVES, Circuit Judge.

On April 1, 1955, Anthony Meyers was brutally shot in the back while walking on a New Orleans sidewalk. Later the wound caused his death. On the evening of April 2, 1955 at 8:50 P.M., Goins, then approximately eighteen years of age, was arrested. Since then, for nearly thirteen years he has remained in custody. The longer part of that time has been spent in death row at the Louisiana State Penitentiary, Angola, Louisiana.

Goins' conviction and sentence were affirmed by the Supreme Court of Louisiana on February 25, 1957.[1] His first federal habeas petition was filed on November 29, 1957. It alleged exhaustion of all remedies available in the Louisiana State Courts. (R. 1.) This allegation was admitted (R. 47, ¶¶ 3 and 5) and there has since been no claim of a failure to exhaust state remedies. On oral argument on the present appeal the Court called to the attention of appellee's counsel the requirement for such exhaustion,[2] and suggested an expression from the appellee in the supplemental brief which appellee proposed to file on the merits of the appeal. No such insistence is contained in that brief, and we therefore hold that this appeal and any further proceeding on the present petition should be conducted as if all available state remedies had been exhausted. See Fay v. Noia, 1963, 372 U.S. 391, 420, 83 S.Ct. 822, 9 L.Ed.2d 837.

Goins' first federal habeas petition was denied before a response had been filed to the show cause order. This Court vacated the judgment and remanded for the filing of a proper response and for a hearing. United States ex rel. Goins v. Sigler, Warden, 1957, 5 Cir., 250 F.2d 128. On remand, after a hearing the district court again discharged the writ. United States ex rel. Goins v. Sigler, E.D. La.1958, 162 F.Supp. 256. District Judge J. Skelly Wright summarized Goins' claim as follows:

"Petitioner's primary contention in this application is that for thirteen weeks following his arrest he was in custody without counsel, and that on the trial of his case in the state court, admissions and a confession made by him during that time were admitted in evidence. It is further contended that the confession was coerced by police brutality." 162 F.Supp. at 257, 258.

1. State v. Goins, 232 La. 238, 94 So.2d 244, cert. den., 355 U.S. 847, 78 S.Ct. 74, 2 L.Ed.2d 57.

2. 28 U.S.C.A. § 2254.

In ruling against Goins, Judge Wright evidenced prophetic insight as to future development of the law:

"Unquestionably, Goins did not receive all the constitutional protection a court sworn to uphold the Constitution would have liked him to have received. He should have had a lawyer sooner than he did. He should not have been subjected, while in custody, to examination by police at odd hours of the night. In spite of the fact that definite progress is being made in the protection of constitutional rights, much is yet to be accomplished. Police do not insist on having a lawyer represent an accused from the moment of his arrest and some persons accused of crime unfortunately have no way of obtaining counsel until the court appoints one to represent them. In the interim, violation of constitutional rights remains an ever-present possibility. * * * He has had due process of law under the Fourteenth Amendment as that clause is currently being interpreted." 162 F.Supp. at 260.

This Court affirmed per curiam. United States ex rel. Goins v. Sigler, 5 Cir., 1959, 272 F.2d 148.

While that appeal was pending, Goins moved in the district court for a new trial on the ground of newly discovered evidence. Benjamin Mackey, Goins' co-defendant, had testified in Goins' trial in rebuttal of Goins' claim that his confession was coerced. The jury returned its verdict finding Goins guilty as charged on October 26, 1955. Five days later, on October 31, Mackey was permitted to plead guilty without capital punishment and was sentenced to life imprisonment. Several years later, in February 1959, Mackey retracted his testimony, and swore that he had seen the police beat Goins and shoot blank cartridges at him during his interrogation. On November 18, 1959, the district court denied the motion for new trial without a hearing. This Court reversed and remanded. United States ex rel. Goins v. Sigler, 5 Cir., 1962, 297 F.2d 533. After a full

hearing, the district court concluded that Goins "has not carried the burden of proving a valid recantation on the part of the witness Mackey." United States ex rel. Goins v. Sigler, E.D.La.1963, 224 F.Supp. 687, 690. This Court affirmed. United States ex rel. Goins v. Walker, Warden, 5 Cir., 1964, 340 F.2d 6.

On September 23, 1965, Goins presented his second federal habeas petition, the one involved on this appeal. On the same day the district court summarily denied the application, by endorsement as follows:

"This court being of the opinion that this application presents no issues that have not previously been considered by this court and decided adversely to petitioner, petitioner's application for habeas corpus is DENIED and his motion for an Order to Stay Execution is also DENIED.

"New Orleans, La. Sept. 23, 1965.
    "E. Gordon West, U. S. District Judge."

This second federal habeas petition is on a mimeographed form. The grounds are stated in response to items 10 and 11 of the form as follows:

"10. State concisely the grounds on which you base your allegation that you are being held in custody unlawfully:

(a) Denial of DUE PROCESS OF LAW

(b) Denial of FAIR TRIAL

(c) Denial of EFFECTIVE AS-SISTANCE OF COUNSEL (See Attached Sheet for Further Grounds.)

"11. State concisely and in the same order the facts which support each of the grounds set out in (10):

(a) Petitioner is a member of the Negro race. The alleged victim (b) was a member of the Caucasian or White race. The Grand Jury which returned the indictment against him (See at-

tached sheet (e) for further facts.)"

The attachment to the form is lengthy, and that part elaborating upon the claimed grounds for habeas corpus is attached as an appendix to this opinion.

On the same day on which the district court summarily denied the application, Judge Wisdom entered the following order for this Court:

"ORDER:—

"The Petitioner's application for issuance of a certificate of probable cause for allowance of this appeal in forma pauperis, and his further application for stay of execution of his death sentence set for 12:00 P.M. midnight, this September 23, 1965, are hereby GRANTED subject to further orders of this Court."

Thereafter, on October 1, 1965, the Court entered a further order as follows:

"BY THE COURT:—

"The Court having ordered the question of exclusion-inclusion of race in jury selection in the cases listed below to be heard en banc on December 16–17, 1965, and it being therefore unable to determine such question as may be present in this appeal, the stay of execution heretofore entered by Judge Wisdom is continued in effect pending further orders of this Court.

"No. 21345—Jackson v. United States

"No. 21256—Rabinowitz v. United States

"No. 21976—Davis v. Davis, Governor

"No. 20814—Scott v. Walker

"No. 22304—Billingsley v. Clayton

"No. 22809—Brooks v. Beto."

The last brief perfecting submission of the present appeal was filed on January 29, 1968. Thus, at long last we reach the merits of this appeal.

### I.

■ It is a "familiar principle that res judicata is inapplicable in habeas proceedings." Fay v. Noia, 1963, 372 U.S. 391, 423, 83 S.Ct. 822, 840, 9 L.Ed.2d 837. In Sanders v. United States, 1963, 373 U.S. 1, 15, 83 S.Ct. 1068, 10 L.Ed.2d 148, the Supreme Court formulated the basic rules to guide the lower federal courts in handling successive applications for federal habeas corpus. The application may be denied without a hearing "where the second or successive application is shown, on the basis of the application, files and records of the case alone, conclusively to be without merit. 28 U.S.C. §§ 2243, 2255." (373 U.S. at 15, 83 S.Ct. at 1077.) The rules formulated in Sanders make it clear that the district court erred in summarily denying the present application without a hearing. See also Labat v. Bennett, 5 Cir. 1966, 365 F.2d 698, 710.

### II.

Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and Miranda v. State of Arizona, 1966, 384 U.S. 436, are not to be applied retroactively. Johnson v. State of New Jersey, 1966, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. The nonretroactivity of Escobedo and Miranda is, however, subject to an important qualification in cases where confessions are claimed to be involuntary or coerced. On that subject, the Court said in Johnson v. State of New Jersey, supra, 384 U.S. at 730, 86 S.Ct. at 1779:

"At the same time, our case law on coerced confessions is available for persons whose trials have already been completed, providing of course that the procedural prerequisites for direct or collateral attack are met. See Fay v. Noia, 372 U.S. 391, [83 S.Ct. 822, 9 L.Ed.2d 837] (1963). Prisoners may invoke a substantive test of voluntariness which, because of the persistence of abusive practices, has become increasingly meticulous through the years. See Reck v. Pate, 367 U.S. 433, [81 S.Ct. 1541, 6 L.Ed.2d 948] (1961). That test now takes specific account of the failure to advise the accused of his privilege against self-incrimination or to allow him access to outside assist-

ance. See Haynes v. [State of] Washington, 373 U.S. 503, [83 S.Ct. 1336, 10 L.Ed.2d 513] (1963); Spano v. [People of State of] New York, 360 U.S. 315, [79 S.Ct. 1202, 3 L.Ed.2d 1265] (1959). Prisoners are also entitled to present evidence anew on this aspect of the voluntariness of their confessions if a full and fair hearing has not already been afforded them. See Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Thus while Escobedo and Miranda provide important new safeguards against the use of unreliable statements at trial, the nonretroactivity of these decisions will not preclude persons whose trials have already been completed from invoking the same safeguards as part of an involuntariness claim."

Again in Davis v. State of North Carolina, 1966, 384 U.S. 737, 740, 741, 86 S.Ct. 1761, 16 L.Ed.2d 895, the Court said:

"The review of voluntariness in cases in which the trial was held prior to our decisions in *Escobedo* and *Miranda* is not limited in any manner by these decisions. On the contrary, that a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation, as is now required by *Miranda,* is a significant factor in considering the voluntariness of statements later made. This factor has been recognized in several of our prior decisions dealing with standards of voluntariness. Haynes v. [State of] Washington, 373 U.S. 503, 510–511, [83 S.Ct. 1336, 1341–1342, 10 L.Ed.2d 513] (1963); Culombe v. Connecticut, 367 U.S. 568, 610, [81 S.Ct. 1860, 6 L.Ed.2d 1037] (1961); Turner v. [Commonwealth of] Pennsylvania, 338 U.S. 62, 64, [69 S.Ct. 1352, 93 L.Ed. 1810] (1949). See also Gallegos v. State of Colorado, 370 U.S. 49, 54, 55, [82 S.Ct. 1209, 8 L.Ed.2d 325] (1962). Thus, the fact that Davis was never effectively advised of his rights gives added weight to the other circumstances described below which made his confessions involuntary."

Thus, there seems to have been no change in the law, but there has been a clarification of its applicability on a review of voluntariness. See Clewis v. State of Texas, 1967, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423; Texas (Beto, Director) v. Payton, 390 F.2d 261, 5 Cir., dated February 12, 1968, ms.

■ If the receipt in evidence of admissions and confessions obtained during the thirteen weeks following Goins' arrest and before he had counsel were the only ground urged in this second application, we do not think that the district court would have been justified in denying habeas corpus without a hearing under all of the circumstances of this case. The applicant was entitled at least to an opportunity to meet his burden to show that, although the ground was determined against him on the merits on his prior application, the ends of justice would be served by a redetermination of the ground. See *Sanders,* supra, 373 U.S. at 17, 83 S.Ct. 1068.

### III.

■ The present application presents, however, an entirely new ground, that of systematic exclusion of Negroes from the grand jury which indicted Goins. In such a case, "full consideration of the merits of the new application can be avoided only if there has been an abuse of the writ or motion remedy; and this the Government has the burden of pleading." Sanders v. United States, supra (373 U.S. at 17, 83 S.Ct. at 1078). No such abuse appears in this case. See Labat v. Bennett, 5 Cir. 1966, 365 F.2d 698, 710.

The impression was general in the South at the time of Goins' trial that the constitutional requirement was met if Negroes were simply represented on the grand jury. That appears from Judge O'Hara's public statement of February 1955 that, "If there are colored persons then on the venire legally qualified for grand jury service I will select *a* colored grand juror." (Emphasis supplied.) It was confirmed by his subsequent conduct in selecting two and only two Negroes to

serve on the grand jury. In United States ex rel. Seals v. Wiman, 5 Cir. 1962, 304 F.2d 53, 66, we noted a like assumption by the Alabama Supreme Court that it would suffice if two Negroes were included in the panel from which the petit jury was struck. Any doubt of the prevalence of that impression is removed by the opinion of the Louisiana Supreme Court in State v. Barksdale, 1964, 247 La. 198, 170 So.2d 374, 382, and particularly by the emphasis added by that Court to a passage quoted:

> "Appellant can only claim the right 'to be * * * tried by juries from which *all* members of his class are not systematically excluded—juries selected from among all *qualified* persons regardless of national origin or descent.' (Emphasis added.) Hernandez v. State of Texas, supra" [347 U.S. 475, at 482, 74 S.Ct. 667, 98 L.Ed. 866].

The *Hernandez* case does not support any such rule of law. The statement in that case related to what the petitioner actually claimed not to what he "can only claim" as a matter of constitutional right. That clearly appears when we quote the entire sentence from its beginning: "His only claim is the right to be indicted and tried by juries from which all members of his class are not systematically excluded—juries selected from among all qualified persons regardless of national origin or descent. To this much, he is entitled by the Constitution." 347 U.S. 482, 74 S.Ct. 673.

■ We adhere to our statement of the law on this subject of token representation in the *Seals* case, supra:

> "Actually, whether the presence of a few Negroes on a venire containing many names is evidence tending to prove or to disprove racial discrimination depends upon the proportions of Negroes and whites who are qualified for jury service. Reece v. [State of] Georgia, 1955, 350 U.S. 85, 87, 88, 76 S.Ct. 167, 100 L.Ed. 77. Fairness in selection does not require proportionate representation of races upon a jury venire. Akins v. [State of] Texas,

1945, 325 U.S. 398, 403, 65 S.Ct. 1276, 89 L.Ed. 1692. It is nonetheless true that very decided variations in proportions of Negroes and whites on jury lists from racial proportions in the population, which variations are not explained and are long continued, furnish sufficient evidence of systematic exclusion of Negroes from jury service. Brown v. Allen, 1953, 344 U.S. 443, 471, 73 S.Ct. 397, 97 L.Ed. 469. It was there said: 'Of course token summoning of Negroes for jury service does not comply with equal protection, Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84.'" 304 F.2d at 66, 67.

In its opinion in the *Barksdale* case, supra, the Louisiana Supreme Court attaches a footnote to the sentence "Since the Eubanks case [Eubanks v. State of Louisiana, 1958, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991], supra, in 1958, Negroes have served on grand juries in Orleans Parish." That footnote lists the ten grand juries empanelled from March 1958 to September 1962, and shows that on eight of those grand juries two Negroes served and on the other two grand juries there was only one Negro.

There is no dispute that at the time of Goins' trial, Negroes comprised about one-third of the population of Orleans Parish. Indeed the courts take judicial notice of the census figures. That percentage of the races in the Parish was recognized by the United States Supreme Court in the *Eubanks* case, 356 U.S. at 586, 78 S.Ct. 970, and by the Louisiana Supreme Court in the *Barksdale* case, 170 So.2d at 382.

Nor is there any dispute of the other facts stated in the opinion in *Eubanks,* 356 U.S. 586, 78 S.Ct. 973:

> "Although Negroes comprise about one-third of the population of the parish, the uncontradicted testimony of various witnesses established that only one Negro had been picked for grand jury duty within memory. And this lone exception apparently resulted from the mistaken impression that the juror was white. From 1936, when the

Commission first began to include Negroes in the pool of potential jurors, until 1954, when petitioner was indicted, 36 grand juries were selected in the parish. Six or more Negroes were included in each list submitted to the local judges. Yet out of the 432 jurors selected only the single Negro was chosen."

The *Eubanks* case and this *Goins* case were almost contemporaneous, when the respective indictments were returned. Eubanks was indicted in 1954. The two successive indictments against Goins were returned in 1955. Their convictions and death sentences were affirmed by the Louisiana Supreme Court on the same day, February 25, 1957, and rehearings in both cases were denied on April 1, 1957. State v. Goins, 232 La. 238, 94 So.2d 244; State v. Eubanks, 232 La. 289, 94 So.2d 262.

The method of grand jury selection in Orleans Parish was described by the Supreme Court in Eubanks (see 356 U.S. at 585, 586, 78 S.Ct. 970). Since *Eubanks*, and prompted by this Circuit's decision in *Collins*,[3] the method of grand jury selection in parishes other than Orleans has been changed so as to require the grand jury to be drawn indiscriminately and by lot, but the procedure in the Parish of Orleans remains that the Judge selects from the grand jury venire the twelve persons to constitute the grand jury and selects one of the jurors to serve as foreman.[4]

The long-standing custom of complete exclusion of Negroes from the Grand Jury in Orleans Parish still persisted when the first indictment was returned against Goins on April 21, 1955. A nolle prosequi was entered on that indictment on September 15, 1955, the same day on which the second indictment was returned.

There is no dispute that two Negroes and only two Negroes served on the grand jury which returned this second indictment. As stated in the appellee's brief last filed on this appeal on January 15, 1968, "It is undisputed that two Negroes served on the Orleans Parish Grand Jury which indicted appellant."

Finally, the Louisiana Supreme Court has recognized that the custom of choosing not more than two Negroes to serve on a Grand Jury in Orleans Parish persisted for many years after Goins' second indictment and certainly to as late as September 1962. See the *Barksdale* opinion, supra, 170 So.2d at 383.

■■ The Louisiana Supreme Court seeks to justify this small number by reasoning as to the educational qualifications of Negroes to serve on grand juries and also by reference to the economic condition of Negroes which caused more Negroes than whites to ask to be excused (see 170 So.2d at 383, 384).[5] That ra-

---

3. Collins v. Walker, 5 Cir. 1964, 329 F.2d 100, second petition for rehearing denied, 335 F.2d 417.

4. La.Code of Criminal Procedure, Art. 413. The "Official Revision Comment" to this article states: "The only significant procedural difference between Orleans Parish and the other parishes in impaneling the grand jury under this article is that in parishes other than Orleans eleven of the twelve grand jurors are drawn by lot from the envelope containing the grand jury venire, whereas in Orleans Parish all twelve are selected by the judge from the grand jury venire." In the recent case of State v. Barksdale, La.1964, 247 La. 198, 170 So.2d 374, 383, 384, it was explained that "Grand Jurors are traditionally chosen by the judge in Orleans

Parish among the more qualified members of the community on the basis of their sober judgment and wider experience." In *Eubanks*, the Supreme Court observed that there was no challenge to "this system of choosing grand jurors" (356 U.S. at 586, 78 S.Ct. at 973), while here appellant's counsel in argument and brief vigorously attacks the system itself. We hope to confine our holding to the application of the system in this case. If that ultimately proves impossible, the broader question of the validity of the system may have to be decided.

5. The element of requested excuses does not enter into the present case which involves simply the choosing of two Negroes, as such, to serve on the grand jury of twelve.

tionale ignores the constitutional imperative that the grand jury must be a "body truly representative of the community." Smith v. State of Texas, 1940, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84; Brooks v. Beto, 5th Cir. 1966, 366 F.2d 1, 11. In state no less than in federal grand juries, the officials charged with choosing jurors "must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community." Glasser v. United States, 1942, 315 U.S. 60, 86, 62 S.Ct. 457, 472, 86 L.Ed. 680; Rabinowitz v. United States, 5 Cir. 1966, 366 F.2d 34, 56. Borrowing from Judge Wisdom's apt expression in his concurring opinion in Brooks v. Beto, supra, 366 F.2d at 28, we are firm in the opinion "that the selection of two, and no more, Negroes, both chosen because of their race [did not cure] the past evils of a discriminatory jury system." [6]

Goins' present application for habeas corpus called attention to Collins v. Walker, 5 Cir. 1964, 335 F.2d 417. Under the *Collins* decision, it would have been unconstitutional for two Negroes to be chosen on the grand jury of twelve on the basis of their race. *Collins* was overruled in Brooks v. Beto, supra, but *Brooks*

left in full force the closely related principle that there must be no exclusion through a system of limited inclusion. See 366 F.2d at 21. In the emphatic words of *Brooks*:

"The dual requirements making awareness of race inevitable must be met, but this must never, simply never, be done as the means of discrimination. It must never, simply never, be applied to secure proportional representation. It must never, simply never, be applied to secure a predetermined or fixed limitation." 366 F.2d at 24.

While there was no hearing in the district court on this second application for habeas corpus, this appeal is from a final judgment and our determination should require no further proceedings to be had except such as may be just under the circumstances. 28 U.S. C.A. § 2106. Under the peculiar circumstances of this case, the basic facts as to systematic exclusion of Negroes from the grand jury which indicted Goins cannot be disputed. It is especially desirable to bring this prolonged habeas corpus litigation to a conclusion without needless further delay.[7] To remand this case for a hearing would be sheer formality.[8]

---

**6.** The majority opinion in that case was based on the fact that Van Zandt County, Texas, had "a population of 10% Negro" (366 F.2d at 9), which is less than one-third of the percentage of Negroes in Orleans Parish. Even if we put to one side the fact that the two Negro grand jurors were chosen because of their race, we observe that it has been mathematically demonstrated as to the *Barksdale* case, supra, that two Negroes on the grand jury of twelve constitutes no more than token representation. See Finkelstein, "The Application of Statistical Decision Theory to the Jury Discrimination Cases," 80 Harv.L.Rev. (Dec. 1966) 338 at 347, 365–373. Certainly it was no less tokenism for only two Negroes to be included in this the first grand jury in Orleans Parish to contain a single Negro.

**7.** The federal courts would adopt no holier-than-thou attitude in this abortive attempt to enforce the criminal law. A

considerable part of the delay has been unnecessarily caused by the federal courts themselves. The lesson for us to learn is to strive for such more efficient judicial administration as is inconsistent with assuring compliance with the Constitution of the United States. The state authorities, legislative and judicial, need no suggestions from us to correct the root cause of a system of grand jury selection in Orleans Parish which lends itself to charges of racial discrimination.

Happily, an otherwise dark picture is relieved by the record of performance over this long period of Goins' appointed counsel, James D McGovern, Jr. Not only unpaid for his services but at considerable personal expense, he has served his client faithfully and diligently for nearly thirteen years.

**8.** However we will remand for a hearing if either party so requests by timely ap-

The judgment of the district court is therefore reversed and the case is remanded with directions to issue the writ releasing Goins from custody on his present conviction and sentence. If the State elects to reindict or re-try Goins, the district court should delay his actual discharge from custody for a reasonable time to be fixed by the court.[9]

Reversed and remanded with directions.

## APPENDIX.

10. State concisely the grounds on which you base your allegation that you are being held in custody unlawfully:

(Continued from page 2 of Government's Form)

(d) Deprivation of RIGHT AGAINST SELF-INCRIMINATION

(e) Indicted by Grand Jury chosen in *racially conscious manner and so as* to systematically exclude qualified Negroes generally and to *purposefully include*, as a token of bad faith attempt at compliance with decisions of United States Supreme Court, one or two Negroes on each Grand Jury more particularly by the *deliberate inclusion* of two Negroes on the Grand Jury which re-indicted Goins after his original indictment by a Grand Jury on which Negroes had been deliberately excluded because of race or color, all prior Grand Juries never having had a Negro knowingly thereon in the history of the Criminal District Court for the Parish of Orleans.

(f) Denial of EQUAL PROTECTION OF LAWS

11. State concisely and in the same order the facts which support each of the grounds set out in (10):

(Continued from page 2 of Government's Form)

(a), (b), (e), (f) Originally was selected in a manner calculated to exclude Negroes thereon generally, and the Grand Jury which re-indicted petitioner was selected *in a manner calculated to insure the purposeful inclusion of two Negroes, as a* token of bad faith attempt at compliance with recent decisions of the United States Supreme Court at the time of re-indictment.

Goins was arrested by the New Orleans Police at 8:50 p. m. on the evening of April 2, 1955. On April 12, 1955, Anthony Meyers having died, Goins was booked with the murder of Anthony Meyers. On April 21, 1955, an all white Grand Jury previously impaneled at the time of his arrest indicted Goins and his alleged accomplice, Mackey, for murder, said indictment bearing docket No. 149–978, and having been alloted to Section "A of the Criminal District Court for the Parish of Orleans, Hon. William J. O'Hara, presiding.

Up to and through this particular Grand Jury which indicted Goins on April 21, 1955, no Negro had ever knowingly served on a Grand Jury in the Criminal District Court for the Parish of Orleans, although it was rumored that one of Negro blood unknowingly had once been appointed years before.

As reported in the local papers of February 3, 1955, and more particularly on page 6 of the New Orleans Times Picayune newspaper, this same Judge William J. O'Hara had issued a formal statement to the press which was quoted extensively to the effect that Negro defendants indicted for capital crimes in Orleans Parish were consistently pleading through their attorneys

---

plication for rehearing and shows that we are mistaken in our thinking that there is no genuine dispute as to any material fact.

9. We make no ruling on whether further prosecution and punishment is permissible

under the circumstances of this case. See United States v. Ewell, 1966, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627.

that "The grand jury is illegally constituted because no negro has ever been selected to serve as a grand juror in Orleans Parish except for one well-known instance wherein a colored person who appeared to be a white person was selected as a grand juror."

(a), (b), (e), (f), "The Plea of these defendants is based upon decisions of the Supreme Court of the United States which declare that regardless what the grand jury selection system may be, if the facts are that a substantial portion of the population is colored and that no colored person has ever been selected as a grand juror for a period of time a prima facia case of systematic exclusion of colored persons from the grand jury is made out."

"The last grand jury I selected was attacked because it was, like preceding grand juries, an all-white grand jury. I defended that grand jury on the ground that no colored person has ever before been selected on a grand jury and the impending police investigation by the grand jury and prevailing public tension was not a propitious time to place the first colored person on the grand jury."

"I have nothing to do with the selection of the next grand jury. If there are colored persons then on the venire legally qualified for grand jury service *I will select a colored grand juror*." (Emphasis supplied.)

In his charge to the next succeeding Grand Jury (which re-indicted Goins) Judge William J. O'Hara stated (and was quoted in the local newspapers) as follows:

"Every person in this community, white and colored, owes it to himself and to the members of the grand jury to inform himself on the application of the 14th Amendment by the supreme court of the United States to indict-

ments returned by consistently all-white grand juries in a community where the population is a mixture of white and colored persons.

"In Orleans parish, some 32 percent of the population is colored.

"Every grand jury selected in Orleans within the memory of man has been an all white grand jury.

On such facts alone, the Supreme Court of the United States has consistently quashed indictments annulled death penalty convictions in Louisiana, Texas, Alabama, South Carolina and Mississippi."

"When a jury selection plan, whatever it is, operates in such a way as always to result in the complete and long continued exclusion of any representative at all from a large group of Negroes, or any other racial group, indictments and verdicts returned, against them by juries thus selected cannot stand."

"Considering this unqualified declaration of the Supreme Court of the United States, and considering that death penalty crimes can be prosecuted only on grand jury indictments, a continuation of the all white grand jury in Orleans would give colored defendants in such cases a critical, technical advantage." New Orleans States, Tuesday, September 6, 1955.

Judge O'Hara then deliberately and being specifically conscious of race selected two and only two negroes to serve on this so-called "Maloney" Grand Jury

(a), (b), (e), (f) This "Maloney" Grand Jury then reindicted Goins and Mackey for murder on September 15, 1955, under No. 151–611, the indictment upon which Goins was convicted and sentenced to death, which new indictment was under court procedure alloted to Section "A", Judge O'Hara, following the same allotment as No. 149–978.

This first indictment (No. 149–978) was nolle prosequied on the same date September 15, 1955—ALL OF WHICH IS MORE FULLY SHOWN BY PHOTOSTATIC CERTIFIED COPIES OF WHICH INDICTMENT ATTACHED HERETO AND MADE A PART HEREOF BY REFERENCE.

The Collins case (Collins v. Walker, 335 F.2d 417 (1964)) holding that the basis of selection of Grand Jurors cannot consciously take race or color into account without discriminating against an accused Negro because of his race and color and without depriving a Negro of equal protection guaranteed by the Fourteenth Amendment, was not final until after November 9, 1964 and well subsequent to Goins' original indictment and conviction in 1955, and the filing of his original United States District Court Application for Writ of Habeas Corpus on November 27, 1957.

(c), (d), Since Goins' original indictment and conviction in 1955, and the filing of his original Federal Court Application for Writ of Habeas Corpus on November 27, 1957, the United States Supreme Court has clarified and broadened many basic constitutional rights guaranteed by the United States Constitution to State Court defendants originally considered not applicable to the States, but now declared applicable to the States by virtue of the *Fourteenth and Fifth Amendments* to the United States Constitution, including the *Gideon* case concerning, the right of Counsel, the *Mapp* case, concerning illegal searches and seizures; and the *Escobedo* case, concerning limitations on interrogation of suspects for the purpose of securing confessions, statements, and/or admissions, in the absence of Counsel and/or in the absence of advice as to said suspects' constitutional rights.

These evolutions of the criminal law were never adverted to *as such* in the reported decisions concerning petitioner's prior application and appeals—although admittedly petitioner attempted to raise them by reference on appeal in Argument and in Brief as well as in his Application for Certiorari to the United States Supreme Court in May of 1965.

Petitioner Goins was likewise never brought before a Committing Magistrate as specifically required by the Louisiana Code of Criminal Procedure then in effect (and in said Code since its adoption in 1928), and now carried in the Louisiana Revised Statutes, RS 15:78, RS 15:79, RS 15:80, RS 15:81 and RS 15:82.

Your defendant's arrest was from its incipiency illegal and null and void because he was *NOT* brought before a committing Magistrate *without unnecessary delay* as is provided in RS 15:79 and RS 15:80, which provides that:

"RS 15:79. JUDGE BEFORE WHOM PRISONER ARRESTED MUST BE BROUGHT: WARRANT

When a peace officer shall have made an arrest with a warrant, he shall, after the prisoner shall have been booked, bring him, without unnecessary delay, before the judge designated in the warrant."

"RS 15:80. JUDGE BEFORE WHOM PRISONER ARRESTED MUST BE BROUGHT: WITHOUT WARRANT

When any person shall have been arrested without a warrant, the peace officer, after he shall have caused him to be booked, shall bring him, without unnecessary delay, if the charge be such as to entitle the accused to a preliminary examination, before the judge having authority to sit as a committing magistrate in the

case, otherwise before the judge having trial jurisdiction thereof."

Likewise, no Counsel was appointed for petitioner nor was he advised of his legal rights from his arrest on April 2, 1955 until Court appointment of an attorney on August 10, 1955 by letter, well after petitioner's statements, admissions, and/or confessions were secured by the New Orleans Police Department. Although petitioner lacks education, alleged oral and alleged written confessions were obtained from him after he had been arrested and *before he had Counsel.*